IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| **BRIAN E. JEFFERS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | Civil Action No. 7:20-cv-00060 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| **JOHN A. WOODSON,** *et al.*, | ) | By: Hon. Michael F. Urbanski |
| | ) | Chief United States District Judge |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

Brian E. Jeffers, a Virginia inmate proceeding pro se, filed a complaint pursuant to 42
U.S.C. § 1983 alleging that defendants Augusta Correctional Center (ACC) Warden John A.
Woodson, ACC nurse J. Jackson, ACC Medical Director April Hanley, Correctional Officer
Clayton, Correctional Officer Custer, other John and Jane Doe correctional officers, Floyd
Burton, M.D., and other John and Jane Doe health officials violated his Eighth Amendment
constitutional right to be free from cruel and unusual punishment.[1]  All the named
Defendants, except Burton,[2] have filed motions for summary judgment.  ECF Nos. 33, 37,
and 52.  Jeffers has responded.  ECF Nos. 42 (see ECF No.45), 59, and 60.  For the reasons
discussed below, the motion is **GRANTED in part and DENIED in part**.

Jeffers contracted yersiniosis, which is a bacterial infection.  Jeffers was hospitalized
for treatment of the yersiniosis infection from May 29, 2018 until June 4, 2018.  Jeffers's

---

[1]  Claims against former defendant Michael Flam, M.D., were previously dismissed. See ECF No. 57.

[2]  Neither the waiver of service form, nor the summons, issued as to Floyd Burton, M.D., have been
returned.  See ECF Nos. 13, 18, 41, 47.

claims in this lawsuit, broadly stated, rest on three separate sets of factual allegations related to his yersiniosis infection: (1) an alleged failure to provide constitutionally adequate medical care in early March 2018; (2) an allegedly contaminated water supply at ACC; and (3) the restraints applied during Jeffers' hospital stay.

The court will grant defendants' motions for summary judgment as to Jeffers' claims related to alleged denial of constitutionally adequate medical care in March 2018, and related to an allegedly contaminated water supply at ACC. The court will deny defendants' motions as to the restraints applied during Jeffers's hospital stay. Accordingly, defendants Jackson and Hanley, are **DISMISSED with prejudice**. Claims against defendants Woodson, Custer, and Clayton will remain in the lawsuit, insofar as Jeffers has alleged excessive use of force by means of the restraints applied during Jeffers's hospital stay.

## I. Legal Standards

### A.      Motion for Summary Judgment

Under Rule 56, summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists only where the record, taken as a whole, could lead a reasonable jury to return a verdict in favor of the nonmoving party. Ricci v. DeStefano, 557 U.S. 557, 586 (2009). In making that determination, the court must take "the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (*en banc*).

A party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but … must set forth specific facts showing that there is a genuine

issue for trial." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  Moreover, "[t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."  <u>Id</u>. at 24-48.  Instead, the non-moving party must produce "significantly probative" evidence from which a reasonable jury could return a verdict in his favor.  <u>Abcor Corp. v. AM Int'l, Inc.</u>, 916 F.2d 924, 930 (4th Cir. 1990) (quoting <u>Anderson</u>, 377 U.S. at 249-40).   The court must determine whether the evidence "'presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  <u>McAirlaids, Inc. v. Kimberly-Clark Corp.</u>, 756 F.3d 307, 310 (4th Cir. 2014) (citing and quoting <u>Anderson</u>, 477 U.S. at 255, 251-52) (internal quotation marks omitted).

## B.    Liability under § 1983

To prevail on a claim for a civil rights violation under 42 U.S.C. § 1983, a plaintiff must establish that he has been deprived of a right, privilege or immunity secured by the Constitution or laws of the United States and that the conduct about which he complains was committed by a person acting under color of state law.  <u>Dowe v. Total Action Against Poverty in Roanoke Valley</u>, 145 F.3d 653, 658 (4th Cir. 1998); <u>see also</u> <u>Conner v. Donnelly</u>, 42 F.3d 220, 223 (4th Cir. 1995).  "Liability will only lie where it is affirmatively shown that the official charged acted personally in the deprivation of the plaintiff's rights.  The doctrine of respondeat superior has no application under [§ 1983]."  <u>Vinnedge v. Gibbs</u>, 550 F.2d 926, 928 (4th Cir. 1977) (quoting <u>Bennett v. Gravelle</u>, 323 F. Supp. 203, 214 (D. Md. 1971)); <u>see also</u> <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658 (1978).

## II.  Discussion

A.      **Claims Relating to Denial of Constitutionally Adequate Medical Care**

1.      **Eighth Amendment Deliberate Indifference – Medical Care**

In order to state an Eighth Amendment claim based on the denial of medical care, a plaintiff must demonstrate that the defendant's actions (or failure to act) amounted to deliberate indifference to a serious medical need.  See Estelle v. Gamble, 429 U.S. 97, 106 (1976).  This requires a showing of two elements.  First, the plaintiff must provide evidence showing that he suffered from an objectively serious medical need.  A "serious medical need" is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008); see also Hudson v. McMillian, 503 U.S. 1, 9 (1992) (explaining that the requirement that a particular medical need be "serious" stems from the fact that "society does not expect that prisoners will have unqualified access to health care").

Second, to show deliberate indifference, the plaintiff must show that subjectively, the defendant was aware of the need for medical attention but failed to either provide it or ensure the needed care was available.  See Farmer v. Brennan, 511 U.S. 825, 837 (1994). "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." Estelle, 429 U.S. at 106.  Instead, the defendant's disregard for the plaintiff's medical condition must have been "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Jackson v. Sampson, 536 Fed. App'x 356, 357 (4th Cir. 2013).

2.      **Factual Background and Analysis**

Jeffers alleges that he contracted the yersiniosis infection when he drank a large glass of water on February 28, 2018, from a tap in his prison cell at ACC.  He alleges that over the course of the following week he experienced abdominal pain, dizziness, a faint feeling, vomiting, severe constipation, and eventually even difficulty standing up.  Jeffers alleges that on March 7, 2018, he requested, and was denied, medical attention.  Jeffers does not state how, or to whom, he made his request for medical attention.  He also does not explain how, or by whom, the request was denied.

Jeffers filed an emergency grievance the same day, March 7, 2018.  Jeffers's emergency grievance was answered that evening by Defendant Jackson.  Jackson advised Jeffers to submit a sick call request.  Jeffers complied, and was scheduled for an appointment on March 10, 2018.  Jeffers alleges he was too ill to walk to the March 10 appointment, and no staff came to escort him.  Jeffers does not allege any request for escort.  Defendants maintain that if an inmate is unable to stand for count (conducted four times daily), security staff make a report and response is provided.  It thus appears that Jeffers was able to stand for count.  Jeffers recovered within about a week after the missed appointment, without the aid of medical intervention.

Jeffers had no further illness until May 29, 2018.[3]  On that date, Jeffers experienced similar symptoms, but more acute than what Jeffers had experienced in March.  By 8:15 p.m., Jeffers had passed out.  Correctional staff discovered Jeffers in his cell, having vomited,

---

[3] Jeffers was scheduled for a medical appointment on May 10, 2018, for an unrelated complaint (hypertension).  He missed this appointment.

rolling around in pain, and with an extremely tender abdomen.  Jeffers was transported to the hospital at 9:35 p.m.

It is highly speculative whether the illness Jeffers experienced in early March 2018, was the same illness (and having the same cause) as the illness for which Jeffers was hospitalized on May 29, 2018.  Jeffers does not allege he experienced ongoing symptoms, nor that he made continuing efforts to obtain medical attention, in the interim between mid-March 2018, and late May 2018.  Jeffers never received a diagnosis for his March 2018 illness, having missed his sick call appointment and not having followed up thereafter.  According to ACC medical records, Jeffers's medical contacts during that period show that he:  (1) was prescribed various medications on March 1, 2018; (2) failed to appear for his scheduled appointment on March 10, 2018 and was "placed on master pass list;" (3) received a TB skin test on March 27, 2018; (4) had an appointment for an unrelated condition (hypertension) on May 10, 2018, but did not appear and was again placed on the master pass list; and (5) was taken to the hospital on May 29, 2018 after he was observed to have passed out in his cell, having vomited, rolling around in pain, and with an extremely tender abdomen.

The yersiniosis diagnosis was not made until Jeffers's hospitalization May 29-June 4, 2018.  There is nothing to connect Jeffers's illness in March 2018, with his yersiniosis infection in late May 2018, other than somewhat similar symptoms.  Such symptoms (abdominal pain, vomiting, fainting or faint feeling) are common to many ailments.  There is no significantly probative evidence that the bout Jeffers experienced in March 2018 was the same as, or was even related to, his later yersiniosis infection.  See Abcor, 916 F.2d at 930.

Regarding his illness in March 2018, Jeffers also alleges flaws in grievance and/or emergency grievance procedures, and failures of training.  Jeffers maintains that emergency medical requests and/or grievances should be, but are not, directed to the regular sick call process.  Jeffers argues that staff and medical staff should follow up with prisoners who fail to appear for a scheduled appointment.  Jeffers alleges that defendants Woodson and Hanley are aware of these deficiencies and have failed to correct them.

The record of response to Jeffers's illnesses, and to his grievances, fails to support this aspect of Jeffers's claims.  Jeffers's emergency medical grievance of March 7, 2018, was answered the same day.  Jeffers was advised to submit a sick call request.  Jeffers submitted the request, and was scheduled for an appointment.  Jeffers missed the appointment.  The record does not provide support for Jeffers's claim that staff should have investigated why he missed his appointment.  There is nothing to indicate that Jeffers was in obvious distress at that time, such that correctional staff should have noticed and arranged for medical attention on his behalf.  When Jeffers did collapse in his cell, on May 29, 2018, staff responded and promptly arranged to have Jeffers transported to the hospital.

For all these reasons, defendants are entitled to summary judgment as to Jeffers's claims based on alleged failure to provide constitutionally adequate medical care in March 2018.  As the events of March 2018 are the only factual basis for Jeffers's claims against defendant Jackson, she will be dismissed from this lawsuit.  To the extent Jeffers's claims against defendants Woodson and Hanley are based on the events of March 2018, those claims are dismissed.

**B.     Claims Relating to Contaminated Water Supply**

1.  **Eighth Amendment Deliberate Indifference – Conditions of Confinement**

A prisoner's conditions of confinement may violate his Eighth Amendment right to

be free from cruel and unusual punishment if there is an "unquestioned and serious

deprivation of basic human needs. Rhodes v. Chapman, 452 U.S. 337, 347 (1981). "The

Constitution ... does not mandate comfortable prisons, and only those deprivations denying

the minimal civilized measure of life's necessities are sufficiently grave to form the basis of

an Eighth Amendment violation." Wilson v. Seiter, 501 U.S. 294, 298 (1991) (quotation

marks and citations omitted).

A prisoner who alleges unconstitutional conditions of confinement must satisfy the

two-part test set forth in Farmer, 511 U.S. at 834. Scinto v. Stansberry, 841 F.3d 219, 225

(4th Cir. 2016). The first, "objective" prong requires a showing that the condition in

question was sufficiently serious in that it posed a substantial risk of serious or significant

physical or emotional harm. Id. (citing De'Lonta v. Angelone, 330 F.3d 630, 634 (4th Cir.

2003)). The second, "subjective" prong requires proof that the prison official acted with

deliberate indifference, meaning that the prison official know of, and disregarded, an

excessive risk to inmate health or safety. Farmer, 511 U.S. at 834, 837. Deliberate

indifference "lies somewhere between negligence and purpose or knowledge: namely,

recklessness of the subjective type used in criminal law." Scinto, 841 F.3d at 225 (citing and

quoting Brice v. Virginia Beach Correctional Center, 58 F.3d 101, 105 (4th Cir. 1995))

[internal quotation marks and citation omitted].

2.  **Factual Background and Analysis**

8

Nothing in the record indicates that Jeffers's medical providers identified a specific source of his yersiniosis infection.  Jeffers alleges that he contracted the yersiniosis infection through contaminated water from his prison tap; specifically, Jeffers pinpoints a glass of water that he drank on February 28, 2018.  Jeffers alleges, and defendants do not seem to dispute, that yersiniosis is usually contracted from either contaminated water, or consumption of undercooked pork.  Jeffers claims he does not eat pork, that he was on a Ramadan fast as of May 29, 2018, and that for these reasons he must therefore have been infected by the tap water in his cell.

Jeffers alleges that ACC had a water contamination problem, that defendants Woodson and Hanley were aware of the problem, and that ACC provided bottled water to staff because of the poor water quality in the facility.  Bottled water is not provided to prisoners.  Prisoners are also prohibited from purchasing bottled water.

Defendant Woodson counters that:  (1) if the water at the prison was contaminated, it would have infected other prisoners as well, which did not happen; (2) ACC's water is supplied by the Town of Craigshead, the water quality is tested annually and Woodson would have been advised of significant problems with the test results, but he received no such report; and (3) water use may be restricted during periods of low rainfall, in which case bottled water is provided to both staff and inmates.

Defendant Hanley avers that she did not start working at ACC until April 18, 2018.  She was in orientation and not privy to information about specific inmates until about mid-May 2018.  To her knowledge, water quality tests for ACC were normal during her tenure there.  Hanley avers specifically that Jeffers was the only inmate diagnosed with yersiniosis.

The singular nature of Jeffers's yersiniosis infection indicates that there was not an unsafe condition at the prison, that could lead to a finding of deliberate indifference on the part of Woodson and/or Hanley.  Jeffers was the only prisoner who contracted yersiniosis. The prisoners at ACC all drink water from the same source, and also their food is understood to be provided from the same kitchen.  If the ACC water supply, or the prisoners' food supply, was contaminated due to the deliberate indifference of prison officials, Jeffers would surely not have been the only prisoner affected by the contamination. Jeffers himself must have drank from the same tap continuously from February 28, 2018 forward, since he had no other source for drinking water.  Yet he apparently suffered no further illness until May 29, 2018.

Whatever the source of Jeffers's infection, there is nothing to indicate that it was a contaminated water supply at ACC.  See Bonano v. Doe, 628 Fed.App'x 25, 28 (2d Cir. 2015) (affirming grant of summary judgment where prisoner "failed to establish a causal link between the water at Ulster Correctional Facility and his disorder"); Ford v. Mercer County Correctional Center, 171 Fed. App'x 416, 421 (3d Cir. 2006) (fact that a pretrial detainee became sick after consuming water "without any other evidence, cannot alone establish that he had, or that the water caused, a serious illness"); see also Duncan v. Hickenlooper, 631 Fed.App'x 644, 649-50 (10th Cir. 2015) (prisoner stated a plausible Eighth Amendment claim against prison officials who had notice of contaminated water supply but did not take corrective measures, whereas there was no plausible claim against director who learned of possible contamination and promptly arranged for an alternative source of water).  This

consideration precludes Jeffers from proving that Woodson and/or Hanley were deliberately indifferent to a condition of poor water quality at ACC.

For all these reasons, defendants are entitled to summary judgment as to Jeffers's claims based on alleged failure to provide safe drinking water.  As this disposes of the only remaining basis for Jeffers's claims against Hanley, she will be dismissed from this lawsuit. To the extent Jeffers's claims against defendant Woodson are based on contaminated water as the source of Jeffers's yersiniosis infection, those claims are dismissed.

## C.    Claims Relating to Hospital Restraints

### 1.    Eighth Amendment Excessive Use of Force

Prisoner cases alleging constitutionally improper restraints have sometimes been analyzed as excessive use of force claims, and in other instances been treated as conditions of confinement claims.  See Karow v. Estate of Heyde, 2017 WL 1194740, at *9, fn.9 (W.D. Wisc. March 30, 2017) (whereas the Third Circuit applies an "excessive force framework," the Seventh Circuit "has assessed the constitutionality of physical restraints under the conditions-of-confinement framework" [citations omitted])  In Goodman v. McCoy, 2013 WL 693103, at *6 (W.D. Va. Feb. 26, 2013), this court applied an excessive force analysis in that it appeared the prisoner's "specific allegations fit more easily into" such an analysis.  See also Bingham v. Garland, 2021 WL 2321674, at *5-6 (W.D.N.C. June 7, 2021) (analyzing use of restraints claim under both standards).  Jeffers's allegations here, as in Goodman, appear to more closely describe an excessive use of force claim.

The Eighth Amendment prohibits "the unnecessary and wanton infliction of pain" through the use of excessive force.  Parker v. Stevenson, 625 Fed.App'x 196, 198 (4th Cir.

2015) [internal quotation marks and citations omitted].  An excessive force claim depends on

"'whether the prison official acted with a sufficiently culpable state of mind.'"  <u>Id</u>. (citing and

quoting <u>Iko</u>, 535 F.3d at 238.  This subjective component turns on "whether force was

applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically

to cause harm."  <u>Iko</u>, 535 F.3d at 239 (quoting <u>Hudson v. McMillian</u>, 503 U.S. 1, 7 (1992)).

The court should consider four nonexclusive factors in evaluating the subjective component

of the analysis:

> (1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of any reasonably perceived threat that the application of force was intended to quell; and (4) any efforts made to temper the severity of a forceful response.

<u>Iko</u>, 535 F.3d at 239.

Various courts, including this one, have held that keeping a hospitalized prisoner in

restraints for a period of days, does not violate the prisoner's Eighth Amendment rights.

<u>Holloman v. Kiser</u>, 2021 WL 1215855, at *5 (W.D. Va. Mar.31, 2021) (prisoner kept in full-

body restraints throughout 50 hour hospital stay was not denied the minimal civilized

measure of life's necessities (citing <u>Farmer</u>, 511 U.S. at 834)); <u>Bosworth v. United States</u>,

2014 WL 4384694, *6 (C.D. Cal. Sept. 4, 2014) (shackling a prisoner during a 24 hour

hospital stay, a significant percentage of which he was likely under sedation or sleeping, was

not objectively harmful under standard of <u>Hudson v. McMillian</u>).

Other courts, including this one, have held that maintaining restraints over a longer

period of time may be an excessive use of force.  <u>Dominguez v. Moore</u>, 149 Fed. App'x 281

(5th Cir. 2005) (prisoner kept in five point restraints and a black box for seven consecutive

days of hospital stay); <u>Kovari v. Brevard Extraditions, LLC</u>, 461 F. Supp. 3d 353, 382 (W.D.

Va. 2020) (prisoner transported in a cramped "cage" for the better part of two weeks, amidst human waste, in the back of a hot van, with few breaks, for up to several days at a time); see also Taylor v. Riojas, 141 S.Ct. 52 (2020) (under a conditions of confinement analysis, summary judgment and qualified immunity defense denied where prisoner kept for six days in "shockingly unsanitary cells" with no reason to suspect the prisoner's conditions could not have been mitigated "either in degree or duration").

The degree of a prisoner's injury is one factor that may suggest whether the use of force could plausibly have been thought necessary in a particular situation. Wilkins v. Gaddy, 559 U.S. 34, 37 (2010) [internal quotation marks and citation omitted]. "Injury and force [] are only imperfectly correlated, and it is the latter that ultimately counts." Id. at 38.

2.      **Factual Background and Analysis**

Jeffers's excessive use of force claim relates to the restraints placed on him during his week-long hospital stay.  Jeffers alleges that he was continuously kept in full transportation restraints.  This meant he was handcuffed, the handcuffs were attached to a waist restraint belt (further restricting movement), a black metal box was placed over the handcuffs and locked to the waist restraint belt, and he was also shackled.  The black metal box further tightens the wrist restraints.  Jeffers wrists were pinched, cut, and bleeding.  His hands swelled with excruciating and numbing "pins and needles" pain.  All four of his limbs were restrained, and he was not permitted any break to exercise or stretch.

The correctional officers who were assigned to guard Jeffers at the hospital, including defendants Clayton, Custer, and John Doe and Jane Doe correctional defendants, refused his requests to loosen the restraints.  The officers did not ask Woodson, or the ACC

Administrative Duty Officer, for approval to loosen the restraints.  On more than one occasion, nurses (including a Mrs. Hope) asked correctional officers to loosen the restraints so that they could administer I.V.s, nevertheless the officers did not seek permission to do so.

Jeffers alleges he was not allowed to provide for his hygienic needs until the fifth day of his hospital stay, when he asked to terminate his treatment and be returned to ACC for this reason.  He was then given a sponge and one of his handcuffs was removed so he could partially clean himself.  Jeffers alleges he was denied use of toothbrush, soap, or deodorant.  Also, that he was not permitted to bathe until he was given the sponge on the fifth day, and he could not use the toilet properly.

Jeffers alleges the deep cuts into his wrists left scars and scabs which were visible ten days after his return from the hospital.  He alleges continuing nerve damage in his wrists.  He alleges the force used against him was unnecessary, excessive, a wanton infliction of pain, and malicious.  Jeffers alleges the restraints were a policy maintained by Woodson.  He also alleges that the restraint policy is applied arbitrarily, at the whim of staff.

Defendants dispute many of Jeffers's factual allegations.  Woodson avers that restraint requirements are in VDOC policies that apply throughout all of VDOC, and that he is not personally involved in writing or issuing the policies.  According to Woodson, there were no requests from hospital staff to change Jeffers's restraints.  If medical staff ask for restraints to be removed, correctional officers are to ask senior medical staff whether flex cuffs may be used.  Removal or relaxation of restraints depends on request from medical staff.

Custer acknowledges he was posted to Jeffers's hospital room for multiple days.  At the beginning of each shift, he checked Jeffers's restraints and placed two fingers under the restraints to ensure the restraints were not too tight.  Custer avers that medical staff never asked him to remove Jeffers's restraints.  If medical staff had asked, he would have sought permission from the shift commander to use alternative restraints.  Jeffers complained the restraints were chafing his wrists.  Custer observed some scratching on Jeffers's wrists.  He placed a piece of sock under the cuffs so they would not rub directly against the skin, and medical staff applied gauze and disinfectant.

Custer agrees that Jeffers was not permitted to shower, but he was given sanitary wipes so he could give himself a sponge bath.  Custer maintains that Jeffers was given opportunity to brush his teeth.  Also, that the procedure for bathroom use was to remove one of the wrist cuffs for this purpose and then place it back on Jeffers's wrist when he was finished.  Custer has no recollection or reason to believe Jeffers suffered any serious harm due to the restraints.

Clayton denies he stayed with Jeffers at the hospital, and avers that the extent of his involvement was to transport Jeffers to the hospital.  Jeffers, in reply, nevertheless maintains that Clayton was "among" the correctional officers who refused to relax his restraints.  Jeffers submits the affidavit of another prisoner, Mustafa-El K.A. Ajala.  Ajala avers that he and Clayton discussed Jeffers's experience with hospital restraints.  According to Ajala,

Clayton stated he "was on that trip" and he "express[ed] some remorse for what Plaintiff Jeffers went through as a result of being handcuffed and shackled for 7 days straight."[4]

Defendants further note that Jeffers was examined by ACC medical staff when he returned from the hospital on June 4, 2018, and that no injuries or complaints were mentioned.  Jeffers did subsequently complain of abrasions and contusions to his wrists, and feelings of numbness and tightness, and was prescribed an over-the-counter nonsteroidal anti-inflammatory drug on June 15, 2018.

In his response, Jeffers reiterates that he was denied basic hygiene, and he was not allowed to shower or even to brush his teeth.  Jeffers argues that VDOC policy allows higher-level administrators to provide written authorization for exceptions to the restraint policy, and that the restraint policy is enforced, or not enforced, arbitrarily.  Jeffers seems to be arguing that it is Woodson's own practice or directive to deny exceptions to the standard restraint policy.  Or, perhaps, that Woodson arbitrarily or deliberately denied to make an exception for Jeffers, whereas exceptions have been made for other prisoners.  This somewhat contradicts Jeffers's argument that the policy is applied arbitrarily by staff.  Jeffers, nevertheless, has presented sufficient disagreement to submit the issue to a fact-finder.  See McAirlaids, 756 F.3d at 310.  In Parkell v. Coupe, 2018 WL 4326961, at *6 (D. Del. Sept. 9, 2018), an inmate who was held in four point restraints throughout a week-long hospital stay created a genuine issue of material fact with his assertion that the warden had personally

---

[4] Another prisoner, Anthony Hall, has provided an affidavit describing his own experience with restraints applied during his hospitalization and surgery.

16

ordered the prisoner be kept in restraints.  Hearsay evidence was sufficient to withstand a motion for summary judgment, even though summary judgment was granted for other reasons, because "[t]here is no indication that Warden Morgan, a party in this case, would not be able to testify at trial or that Plaintiff's nurses are not available to provide testimony." Id.

Jeffers's allegation that medical staff requested removal of the restraints so that they could provide care, also precludes entry of summary judgment on the current record.  It is conceivable that Jeffers may be able to produce evidence from his hospital records, or through the testimony of hospital staff, in support of his allegations that medical providers specifically requested removal of his restraints for purposes of providing medical care, and that such requests were summarily denied, and whether this impeded provision of medical care.  This would be a consideration in applying the Iko factors.  535 F.3d at 239.

### III.  Conclusion

For the foregoing reasons, the court:  (1) **GRANTS** defendant Hanley's motion for summary judgment, ECF No. 33; (2) **GRANTS** defendant Jackson's motion for summary judgment, ECF No. 37; (3) **DENIES** defendant Clayton's motion for summary judgment, ECF No. 52; and (4) **DENIES** defendant Custer's motion for summary judgment, ECF No. 52; and (5) **DENIES** defendant Woodson's motion for summary judgment as to Jeffers's claim for use of excessive force, ECF No. 52.

An appropriate order will be entered.

Entered: August 3, 2021

Michael F. Urbanski
Chief U.S. District Judge
2021.08.03 15:45:45
-04'00'

Michael F. Urbanski
Chief United States District Judge